J-S04008-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| AMEER MURPHY | : | |
| | : | |
| Appellant | : | No. 2263 EDA 2021 |

Appeal from the PCRA Order Entered October 14, 2021
In the Court of Common Pleas of Philadelphia County
Criminal Division at CP-51-CR-0005908-2015

BEFORE:   MURRAY, J., KING, J., and PELLEGRINI, J.*

MEMORANDUM BY MURRAY, J.:                    **FILED APRIL 21, 2023**

Ameer Murphy (Appellant) appeals from the order dismissing his first petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

This Court previously detailed the underlying facts:

On March 16, 2015, just before 10:00 p.m., Leon Williams [(Williams)] sat on his porch at 6053 Irving Street in West Philadelphia, between 60th and 61st Streets.  As he sat on the porch smoking cigarettes, he noticed his nephew, the decedent Marquan Royster [(the decedent)], approaching him from the opposite side of Irving Street via 61st Street. After Williams called out, "Hey Nephew!" to the decedent, Appellant … and an unidentified individual walked onto the block from 61st Street and started following the decedent.  In response, the decedent began to jog away from the pair.  After the three passed Williams' home, Appellant and his accomplice drew laser-sighted pistols and fired what Williams thought was three to four shots at the decedent in the middle of the street.  As the decedent lay dying, Appellant and

_____

* Retired Senior Judge assigned to the Superior Court.

his accomplice turned around, ran past Williams' house for a second time, entered a red vehicle parked on 61st Street, and drove away. Williams saw Appellant's face after Appellant passed by the home for a second time.

From his living room at 6052 Irving Street, across the street from Williams' home, Norman Gay [(Gay)] heard gunfire as he watched television. After going onto his porch to investigate, Gay observed Appellant and his co-conspirator, wearing sweatshirts and hoodies, run towards his house from the middle of the street to the [] sidewalk, carrying laser-sighted pistols in their hands. As he ran past Gay's home, Appellant's hood came off his head, permitting Gay to observe [Appellant's] face as he approached and ran under a streetlight. After Appellant reached the front stairs onto Gay's porch, Gay's wife pulled him inside the home. Minutes later, Gay returned to the porch and observed a crowd in the middle of the street.

At 9:54 p.m., Philadelphia Police Officer Gary Mercando and Sergeant Mirriam Joseph received a radio call for a shooting near 60th and Irving Streets. Upon arrival, the officers worked their way through a crowd of about eight people to the decedent's body, which lay face down in the middle of Irving Street. After discovering that the decedent was non-responsive, the officers carried him into the back of their squad car and drove him to Presbyterian Hospital, where he was pronounced dead.

Dr. Edwin Lieberman, a forensic pathologist formerly with the Philadelphia Medical Examiner's Office, performed the decedent's autopsy and generated a report. The decedent suffered two gunshot wounds, including a perforating gunshot wound to the rear-left side of his head, which was immediately fatal, and a perforating gunshot wound to his right shin. Each gunshot wound was consistent with the decedent running away from his assailants. Assistant Medical Examiner Dr. Khalil Wardak, an expert in forensic pathology, conducted an independent review of Dr. Lieberman's report and photographs associated with the instant offense. At trial, Dr. Wardak testified, to a reasonable degree of medical certainty, that the manner of death [was] homicide, caused by a gunshot to the back of the head.

Officer Michael Lombardi arrived at Irving Street shortly after the shooting and secured the area. There, he discovered five fired cartridge casings ("FCCs") on the street. The

Philadelphia crime scene unit ultimately recovered three .380 caliber FCCs and four .45 caliber FCCs and one .3[80] caliber [] and .45 projectile, respectively. Ann Marie Barnes, an expert in ballistics, reviewed the ballistics recovered from the scene and determined that each .380 caliber FCC and each .45 caliber FCC were fired from the same weapon for each respective caliber.

Homicide detectives Frank Mullen and Thorsten Lucke recovered a surveillance video from the Baez Grocery Store on 61st Street near the scene of the shooting. While the video did not show the shooting itself, it does show a red vehicle parking near Irving Street before the shooting, and the decedent walking out of the store immediately prior to the shooting.

At approximately 11:37 p.m. on [the night of the shooting], Appellant arrived at the Camden Medical Center in Camden, New Jersey, suffering from a gunshot wound to the foot. After he arrived, Officer Jeffrey Kostopolis of the Camden City Police Department interviewed [Appellant], who identified himself as Quateer Brown, and gave an address of 3133 Tasker Street in South Philadelphia. At the hospital, Appellant explained that he was waiting for his paramour[,] Jevana Robinson [(Robinson),] at 4th and Erie Streets in Camden, where he was shot in the foot and after which Robinson drove him to the hospital. Camden City Police investigated the area around 4th and Erie and discovered no evidence of a shooting.

In March 2015, Philadelphia homicide detectives received information identifying a phone number associated with Appellant. Detective John Verrecchio [(Detective Verrecchio)] prepared a search warrant for the phone number (215) 251-3547, associated with Appellant[,] and on March 31, 2015, Detective Verrecchio received the cell phone records. Detective Thorsten Lucke also reviewed the records and discovered that at 7:15 p.m. on March 16, 2015, the user of the cell phone texted an unidentified contact, "This is Meer Meer." The phone further contained selfies of Appellant and a photo of Appellant in the hospital with a foot wound. The internet search history of the phone also revealed that the user, on March 17, 2015, searched for a news article concerning the instant shooting. The [p]hone's user history was further littered with images of dirt bikes and pornographic videos.

At 6:00 a.m. on April 1, 2015, Philadelphia police officers obtained and executed a search warrant for Appellant's home at

3138 Tasker Street in South Philadelphia. There, officers recovered the iPhone 5c associated with the (215) 251-3547 number and detained Appellant to question him at the homicide unit within the Police Administration Building. That morning, homicide detective Thomas Gaul **Mirandized**[1] and interviewed Appellant, who gave detectives consent to search the phone.

During the interview, Appellant denied any involvement in the homicide, but explained to the detective that the decedent was killed in retaliation for the murder of [Appellant's] best friend Damien James [(James)]. Appellant further claimed that he shot himself on the corner of 25th and Moore Streets in South Philadelphia, that he went to Camden, New Jersey[,] for medical treatment, and gave doctors a fake name while he was there, but did not explain why. Detective Gaul examined police reports for that night and discovered a complaint about two males who were shot on the 1600 block of South Taylor Street in South Philadelphia.

At 8:00 p.m. that evening, Detective Verrecchio re-**Mirandized** Appellant and conducted a second interview. Then, Appellant described how he was in South Philadelphia at the time of the shooting, and that there was an ongoing conflict between a group of males from 20th Street against a group from 24th Street. Appellant identified himself as a member of the 20th Street group[] and described the decedent as a member of the opposing faction. James, whose death Appellant described as a catalyst for the conflict between the groups and the instant shooting, was a member of the 20th Street group with Appellant.

Before the interview, Detective Verrecchio examined the phone records for the 3547 number, which contained geolocation information for each phone call. By entering the coordinates into a Google Maps search, Detective Verrecchio was able to create a map for each phone call, demonstrating that the user was in West Philadelphia near [] 61st and Irving Streets at the time of the shooting. When Detective Verrecchio confronted Appellant with this map during the interview, Appellant exclaimed that "[his] life [was] over," and asked Detective Verrecchio if [Appellant] could

_____

[1] **See Miranda v. Arizona**, 384 U.S. 436 (1966) (a defendant subject to custodial interrogation must be advised of his constitutional right to remain silent and his right to a lawyer in clear and unequivocal language).

- 4 -

[accept culpability for] the whole case himself without naming any other associates. After further questioning, Appellant refused to sign a written statement, but Detective Verrecchio prepared his own summary of the interview.

After Appellant's arrest, Detective James Dunlap, an expert in cell phone tower analysis, analyzed the records for the phone associated with Appellant and identified more than three dozen connections on March 16, 2015. Between 7:50 p.m. and 9:21 p.m., the phone associated with Appellant made seven connections at the tower located at 63rd and Walnut Streets, near the scene of the shooting. At 9:53 p.m., the phone associated with Appellant made a call from a different sector of the same tower. From 9:56 p.m. to 10:05 p.m., the phone travelled from a series of towers further west, connecting with towers in Upper Darby, Pennsylvania, the 6700 block of Baltimore Avenue in West Philadelphia, 58th and Springfield Streets, and on 67th and Essington Streets. By 10:19 p.m., the phone connected with a tower on Passyunk Avenue in South Philadelphia. Between 10:19 and 11:18, the phone connected with numerous towers in an area between Broad Street and Interstate 76 west east to west [*sic*] and from South Street down to Passyunk Avenue north to south. At 11:27 p.m., the phone connected with a tower in Camden, New Jersey, near the Camden Medical Center. At trial, Detective Dunlap testified that the time and location of the connections indicate that the use of the phone was in the area of the shooting at the time it occurred, and then was inside a vehicle that travelled between the identified towers.

At trial, Appellant's mother, Questina Woods [(Woods)], testified that the 3547 numbered phone belonged to her daughter, but that [Woods] was in possession of the phone on the evening of the shooting, and the phone was in [Woods'] possession while she was visiting a prospective new home at 57th and Hazel Avenue in West Philadelphia, blocks from where the shooting occurred. On cross-examination, when confronted about pornography discovered on the phone, Woods testified that she often used her phone to search for pornography, but could not explain answers to text messages identifying the user as "Meer Meer," Appellant's nickname.

Appellant elected to testify at [his jury] trial and explained that he was at 24th and Morris Streets from 6:00 to 10:30 p.m. Then, while Appellant and his friend Lawrence Shiver sat in a Buick

LeSabre, an unidentified vehicle pulled up next to them and fired into the passenger compartment, striking Appellant in the foot. After that shooting, Appellant went to Woods' home, and had her drive him to a hospital in Camden, New Jersey. Appellant elected to check into a New Jersey hospital and provided a pseudonym, he explained, because he feared being arrested for a probation violation if he treated his wound in Philadelphia. Appellant further claimed that Woods had the 3547 numbered cell phone from 6:00 p.m. until [Appellant's] arrival at the Camden Medical Center.

*Commonwealth v. Murphy*, 222 A.3d 847 (Pa. Super. 2019) (unpublished memorandum at 1-10) (footnote added; citation and some brackets omitted).

In April 2015, the Commonwealth charged Appellant with murder and related offenses. Prior to trial, on January 8, 2018, the Commonwealth offered Appellant a negotiated plea of an aggregate 25 - 50 years in prison, in exchange for pleading guilty to third-degree murder, conspiracy, and firearms offenses. As discussed below, Appellant repeatedly rejected the offer, which the trial court confirmed in a colloquy on the record. *See* N.T., 1/8/18, at 40-44, *infra*; N.T., 4/2/18, at 12-18, *infra*.

The case proceeded to trial in April 2018. George S. Yacoubian, Esquire (Trial Counsel), represented Appellant. On April 6, 2018, the jury found Appellant guilty of first-degree murder, conspiracy to commit murder, possession of an instrument of crime, and two firearms offenses. The trial court sentenced Appellant to life in prison that same day. Appellant did not file post-sentence motions.

Appellant filed a direct appeal claiming the trial court erred in admitting a witness's prior written statement into evidence. This Court rejected

- 6 -

Appellant's claim and affirmed the judgment of sentence. *See Murphy*, 222 A.3d 847 (unpublished memorandum at 11-15). Appellant petitioned for allowance of appeal, which the Pennsylvania Supreme Court denied. *Commonwealth v. Murphy*, 227 A.3d 311 (Pa. 2020). Appellant did not seek review with the United States Supreme Court.

On June 9, 2021, Appellant filed the instant, timely PCRA petition,[2] his first, through Attorney Todd M. Mosser (PCRA Counsel). Appellant claimed he

> is entitled to relief based on [T]rial [C]ounsel's failure to renew his motion for a mistrial after the Commonwealth repeatedly asked [Commonwealth] witnesses if they knew a group of young men seated in the gallery [at trial,] in an attempt to create the inference of witness intimidation.

PCRA Petition, 6/9/21, ¶ 9.

On August 19, 2021, the Commonwealth filed a response in which it argued that Appellant's ineffectiveness claim lacked merit. A week later, the PCRA court issued Pa.R.Crim.P. 907 notice of intent to dismiss Appellant's petition without a hearing. Appellant did not respond. By order and opinion

---

[2] PCRA petitions must be filed within one year of when the petitioner's judgment of sentence becomes final. 42 Pa.C.S.A. § 9545(b)(1); *see also id.* § 9545(b)(3) (a judgment of sentence becomes final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review."). Here, Appellant's judgment of sentence became final on June 14, 2020, ninety days after the expiration of time to seek *certiorari* with the United States Supreme Court. Thus, Appellant's June 9, 2021, petition is timely. *See also* PCRA Court Order and Opinion, 10/14/21, at 7 (concluding Appellant's "instant petition is timely.").

entered October 14, 2021, the PCRA court dismissed Appellant's PCRA petition.

Appellant timely filed a notice of appeal. On November 9, 2021, the PCRA court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors. Appellant timely complied, through PCRA Counsel, on November 30, 2021.[3]

On March 14, 2022, Appellant *pro se* filed a petition in this Court seeking permission to proceed *pro se* and a hearing pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998). Appellant further claimed he was entitled to relief

> in light of the recent PA Supreme Court decision in **Commonwealth v. Bradley**, 261 A.3d 381 (Pa. 2021)[,] where the Court held that [a] PCRA petitioner may raise claims of PCRA counsel's ineffectiveness at [the] first opportunity to do so, even when on appeal.

Petition for **Grazier** Hearing, 3/14/22, ¶ 1.

On April 14, 2022, PCRA Counsel filed an application to withdraw based on Appellant's stated intention to raise claims of PCRA Counsel's ineffectiveness pursuant to **Bradley**. Application, 4/14/22, ¶¶ 2-3; **see also** **id.** Ex. A (Appellant's April 5, 2022, correspondence to PCRA Counsel). PCRA

---

[3] Appellant asserted the same claim raised in the PCRA petition, *i.e.*, Trial Counsel was ineffective for "failing to renew his motion for a mistrial after the Commonwealth repeatedly asked witnesses if they knew a group of young men seated in the gallery in an attempt to create the inference of witness intimidation." Concise Statement, 11/30/21, at 1.

Counsel averred, "in light of the claims that Appellant wishes to pursue, the undersigned counsel is required to withdraw from further representation in this matter." *Id.* ¶ 5; *see also Commonwealth v. Koehler*, 36 A.3d 121, 132 (Pa. 2011) (as a general rule, counsel cannot raise their own ineffectiveness).

On April 25, 2022, this Court remanded the case for the PCRA court to conduct a *Grazier* hearing to determine whether Appellant's request to proceed *pro se* was knowing and voluntary. Order, 4/25/22. The PCRA court then held a *Grazier* hearing at which Appellant announced he "does not wish to represent himself." Order, 5/31/21. The PCRA court granted PCRA Counsel permission to withdraw and appointed Joseph Schultz, Esquire, to represent Appellant.[4] *Id.* The PCRA court returned the record to this Court. Appellant, through Attorney Schultz, presents two issues for review:

> [1.] Whether PCRA [C]ounsel was ineffective under the Sixth Amendment for failing to identify and raise the claim that [T]rial [C]ounsel was ineffective for failing to adequately consult with [Appellant] about the wisdom of accepting the Commonwealth's offer to plead guilty?
>
> [2.] Whether PCRA [C]ounsel was ineffective under the Sixth and Fourteenth Amendments for failing to identify and raise the claim that [T]rial [C]ounsel was ineffective for failing to object to the trial court's defective jury instruction on accomplice liability in that the court failed to instruct that for [Appellant] to be convicted of first-degree murder as an accomplice, the Commonwealth must

---

[4] *See* Pa.R.Crim.P. 904(C) (providing "when an unrepresented defendant satisfies the judge that the defendant is unable to afford or otherwise procure counsel, the judge shall appoint counsel to represent the defendant on the defendant's first petition for post-conviction collateral relief.").

prove that [Appellant] shared the shooter's specific intent to kill? Appellant's Brief at viii.

"When reviewing the denial of a PCRA petition, an appellate court must determine whether the PCRA court's order is supported by the record and free of legal error." *Commonwealth v. Drummond*, 285 A.3d 625, 633 (Pa. 2022) (citation, quotations, and footnote omitted).

Preliminarily, we recognize that in *Bradley*, our Supreme Court held "a PCRA petitioner may, after a PCRA court denies relief, and after obtaining new counsel or acting *pro se*, raise claims of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal." *Bradley*, 261 A.3d at 401; *see also Commonwealth v. Crumbley*, 270 A.3d 1171, 1175 (Pa. Super. 2022) (under *Bradley*, "layered claims of ineffective PCRA counsel may now be raised for the first time on appeal if that is the earliest practical opportunity to do so.").

The Supreme Court recently expanded on *Bradley*, stating:

We recognized that the structure of appeal and collateral review "places great importance on the competency of initial PCRA counsel," and reasoned that "it is essential that a petitioner possess a meaningful method by which to realize his right to effective PCRA counsel." *Bradley*, 261 A.3d at 401. We stated that "this approach best recognizes a petitioner's right to effective PCRA counsel while advancing equally legitimate concerns that criminal matters be efficiently and timely concluded." *Id.* at 405. We further explained:

In some instances, the record before the appellate court will be sufficient to allow for disposition of any newly-raised ineffectiveness claims. *Commonwealth v. Holmes*, 79 A.3d 562, 577 (Pa. 2013). However, in

- 10 -

other cases, the appellate court may need to remand to the PCRA court for further development of the record and for the PCRA court to consider such claims as an initial matter. Consistent with our prior case law, to advance a request for remand, a petition would be required to provide more than mere "boilerplate assertions of PCRA counsel's ineffectiveness," **Commonwealth v. Hall**, 872 A.2d 1177, 1182 (Pa. 2005); however, where there are "material facts at issue concerning claims challenging counsel's stewardship and relief is not plainly unavailable as a matter of law, the remand should be afforded[.]" **Commonwealth v. Grant**, 813 A.2d 726, 740 n.2 (Pa. 2002) (Saylor, J., concurring).

> **Id.** at 402. We also stated that [Pa.R.A.P.] 302(a), which provides that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal," Pa.R.A.P. 302(a), "does not pertain to these scenarios." **Id.** at 405.

**Commonwealth v. Parrish**, 273 A.3d 989, 1002 (Pa. 2022) (some brackets omitted and citations modified).

Instantly, we conclude Appellant "adequately raised and preserved his layered claim[s] of the ineffective assistance of [T]rial … [C]ounsel by raising [them] at the first opportunity to do so, specifically in … his brief filed with this Court in this appeal." **Id.** at 1002. The Commonwealth concedes that Appellant "is permitted to raise these claims on appeal because it was his 'first opportunity to do so.'" Commonwealth Brief at 11 (quoting **Bradley**, 261 A.3d at 401); **cf. Commonwealth v. Womack**, 2022 WL 17099016 (Pa. Super. 2022) (unpublished memorandum at 2-3) (agreeing with Commonwealth's waiver argument where PCRA petitioner raised PCRA counsel's ineffectiveness for the first time in his appellate brief, but not his court-ordered Rule 1925(b) concise statement). Further, our review of the

record reveals that it is "sufficient to allow for disposition of [Appellant's] newly [] raised ineffectiveness claims." ***Parrish***, ***supra***.

In his first issue, Appellant claims PCRA Counsel was ineffective for "failing to identify and raise the claim that [T]rial [C]ounsel was ineffective for failing to adequately consult with [Appellant] about the wisdom of accepting the Commonwealth's offer to plead guilty." Appellant's Brief at 9.[5] Our Supreme Court has instructed that for "a petitioner to properly raise and prevail on a layered ineffectiveness claim, sufficient to warrant relief if meritorious, he must plead, present and prove" the ineffectiveness of appellate/PCRA counsel, which "necessarily reaches back" to the actions of trial counsel. ***Commonwealth v. McGill***, 832 A.2d 1014, 1022 (Pa. 2003) (emphasis omitted). Counsel "is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." ***Commonwealth v. Koehler***, 36 A.3d 121, 132 (Pa. 2012) (citation omitted); ***see also Commonwealth v. Charleston***, 94 A.3d 1012, 1019 (Pa. Super.

_____

[5] Appellant correctly avers that this claim is cognizable under the PCRA. ***See*** Appellant's Brief at 14-15 (citing ***Commonwealth v. Lynch***, 820 A.2d 728, 732 (Pa. Super. 2003) ("If the ineffective assistance of counsel caused the defendant to enter an involuntary or unknowing plea, the PCRA will afford the defendant relief."); ***see also id.*** at 14 (citing ***Commonwealth v. Albert***, 561 A.2d 736, 738-39 (Pa. 1989) (recognizing, "at the very least, appellant must be allowed the right to have an appeal aided by competent counsel. The guidance and representation of an attorney should assure that meritorious legal issues are recognized and addressed, and that meritless claims are foregone.")).

2014) (to establish prejudice, a petitioner must show that absent counsel's conduct, there is a "reasonable probability" that the outcome of the proceedings would have been different). "In determining a layered claim of ineffectiveness, the critical inquiry is whether the first attorney that the defendant asserts was ineffective did, in fact, render ineffective assistance of counsel." *Commonwealth v. Burkett*, 5 A.3d 1260, 1270 (Pa. Super. 2010). "If that attorney was effective, then subsequent counsel cannot be deemed ineffective for failing to raise the underlying issue." *Id.* Finally, when "evaluating ineffectiveness claims, judicial scrutiny of counsel's performance must be highly deferential." *Commonwealth v. Lesko*, 15 A.3d 345, 380 (Pa. 2011) (citation and quotation marks omitted).

Appellant argues Trial Counsel "was ineffective for failing to adequately advise or urge [Appellant] to accept the plea offer, [and] PCRA [C]ounsel was ineffective for not raising this claim in his amended petition." Appellant's Brief at 14. With respect to Trial Counsel's representation, Appellant avers it "is not enough for counsel to merely repeat the plea terms, the sentence possibilities, and the chances of trial success." *Id.* at 11.[6] Appellant claims "[n]ot only did [T]rial [C]ounsel fail to discuss the plea offer fully, but he also deprived [Appellant] of the opportunity to make a reasonably informed

---

[6] According to Appellant's counsel, he contacted Trial Counsel, "who stated that he has no recollection of the details about the plea offer." Appellant's Brief at 9 n.2 (citing November 3, 2022, email from Trial Counsel, Ex. B).

decision on whether to accept the plea offer or go to trial." ***Id.*** at 12-13; ***see also id.*** at 12 (asserting Trial Counsel "took a neutral position on the plea."). In the alternative, Appellant claims Trial Counsel "should have accepted on [Appellant's] behalf when the trial court offered to keep the plea [offer] open for another week." ***Id.*** at 12. Appellant contends "PCRA Counsel had no reasonable basis for failing to raise [T]rial [C]ounsel's ineffectiveness," ***id.*** at 15, and such failure prejudiced Appellant, who "is willing to testify that he would have accepted the [plea] offer." ***Id.*** at 16.

The Commonwealth counters:

> [Appellant's] argument is fatally undermined by his unequivocal rejection of the plea offer following two thorough colloquies, during which the trial court generously described just how favorable the plea offer was as well as the risks of going to trial.

> * * *

> [Appellant's] resolute rejection of the plea offer belies his current claim that he would have accepted it if only [T]rial [C]ounsel had urged him more forcefully. [Appellant] confirmed that he knew he risked a mandatory sentence of life imprisonment without parole for first-degree murder by taking his case to trial. [Appellant] was unmoved by the prospect of [being released on] parole in his mid-40's or stories about others who had been in his position and regretted going to trial. The trial court offered [Appellant] multiple occasions to change his mind, and [he] rejected each one. … The strength of [Appellant's] resolve to go to trial was established by the record and conclusively establishes that [T]rial [C]ounsel could not have prevailed upon [Appellant] to accept the plea offer. For that reason, this claim fails for lack of prejudice.

Commonwealth Brief at 13, 14-15. The Commonwealth further observes that Appellant "never explains what [Trial C]ounsel could or should have told him differently…." *Id.* at 15.

"A criminal defendant has the right to effective counsel during a plea process as well as during a trial." *Commonwealth v. Kehr*, 180 A.3d 754, 760 (Pa. Super. 2018) (citation omitted); *see also Lafler v. Cooper*, 566 U.S. 156, 162 (2012) ("Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process" (citations omitted)).

However,

> a post-conviction petitioner seeking relief on the basis that ineffective assistance of counsel caused him or her to reject a guilty plea must demonstrate the following circumstance:

> > [B]ut for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that **the defendant would have accepted the plea** and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Commonwealth v. Steckley*, 128 A.3d 826, 832 (Pa. Super. 2015) (emphasis added) (quoting *Lafler*, 566 U.S. at 164).

Here, the trial court advised Appellant, prior to trial, as follows:

[THE COURT]: **The bottom line is, [Appellant,] you are being given an opportunity**. It then becomes in your control, if the parole board would parole you, to be released in your late 40s. Am I correct in my math?

- 15 -

[Trial Counsel]: Yes, Your Honor.

THE COURT: Versus dying in prison. That is not my decision, that is not your attorney's decision, that is not the Commonwealth's decision, other than making the offer, as to whether or not to accept that offer.

Do you understand that, sir?

[Appellant]: Yes.

THE COURT: **You, and you alone, can make a decision about whether or not you wish to enter into that plea. Do you have any questions, first of all, about the plea?**

[Appellant]: **No.**

THE COURT: Do you understand what the Commonwealth has to prove to convict you?

[Appellant]: Yes.

THE COURT: **Do you understand what the possible penalties are?**

[Appellant]: **Yes.**

THE COURT: And have you had sufficient opportunity to discuss the defenses in your case? I know your attorney has filed an alibi defense. In essence, as I understand it, you were shot in the foot that day, and the defense is, I was not shot at the scene of this crime. I was shot at the scene of another crime.

Am I correct, counsel?

[Trial Counsel]: That's correct.

* * *

THE COURT: … [H]as [Trial] [C]ounsel reviewed with you all possible defenses?

[Appellant]: Yes.

- 16 -

THE COURT:  **Has he reviewed the conditions of this plea with you?**

[Appellant]:  *Yes.*

THE COURT:  And **has he given you** … **his opinion, or his advice, as to whether or what you should consider before you make up your mind?**

[Appellant]:  *Yes.*

THE COURT:  Okay.  **Has he answered all questions that you had in that regard?**

[Appellant]:  **Yes.**

THE COURT:  So are you prepared to make a decision as to whether or not you wish to enter into this plea or whether you wish to proceed for trial?  I was assuming you wanted to go to trial because that was what your attorney was telling me, so that's why we went through all of these dates.  But I apologize for that.  Now, … **I should have asked you, first, whether or not you wish to plea or accept that negotiation**.  I was assuming that you were not, but do you understand I shouldn't assume anything?

[Appellant]:  **I don't want to accept it.**

THE COURT:  Okay.  **So you're rejecting it?**

[Appellant]:  **Yes.**

THE COURT:  **I am going to give you an opportunity, if you want it.  I will request that the DA hold off and keep that offer open for another week or so if you want more time to talk with your family members or anyone else, or are you adamant that you're ready to make that decision today?**

[Appellant]:  Yes, **I'm ready to make it today.**

THE COURT:  Then what is your decision, sir?

[Appellant]:  **I'm not taking it**.

- 17 -

N.T., 1/8/18, at 40-44 (emphasis added; some capitalization modified).

Again, prior to the commencement of trial, the trial court thoroughly colloquied Appellant about his decision to reject the plea offer:

> THE COURT:  … [F]or many years I've sat where your counsel sat, and I know **there's a misimpression in the prison where guys will talk to other guys and say, [″]Don't worry about it, go to trial, because if you lose, you'll get reversed on appeal.[″]**
>
> My response to them was, [y]ou're listening to people who couldn't save themselves?  You're listening to people in prison that got convicted already?  You should listen to me.
>
> I don't know what happened [the] day [of the shooting].  I'm not your attorney.  You have a fine attorney.  And I don't know what your communications have been between the two of you, but he's there to give you advice.  Ultimately, you make the decision because you do the time.  …
>
> * * *
>
> [THE COURT]:  I'm telling you this for a variety of reasons, but we have a few more minutes before we get started.
>
> **Why don't you tell me for a second while you think I'm telling you all this?**
>
> [Appellant]:  **Because you know how serious it can get.**
>
> THE COURT:  Right.  And this is the time that you have to make the best decision for you.  And you have to consider your options, weigh the advantages of pleading and the disadvantages.  I'll tell you what I tell everyone.  I don't want anyone ever in this courtroom to plead guilty when they didn't do it or plead no contest or plead anything else.
>
> But I would like someone who is your age, young, who, if they did do something and made a serious mistake, I don't want to send you to jail for the rest of your life.  I don't want to do it.  There are certain cases that as a judge, yeah, maybe, I would send someone to jail for the rest of their lives without thinking

twice. Generally speaking, it's not a 20-year-old, because I realize that things happen on the street that shouldn't happen. But I have to do that.

You know, now that I've been practicing here in the city for almost 40 years, I have a better sense of what that time is like. Before, when I was still practicing [law], I would get letters from people that would tell me … I should have listened to you; I'd be out by now. Those were hard letters to read.

Again, it's your call. **We're taking the time to make sure you understand everything. I think you do. We've had conversations in the past. Do you have any questions?**

[Appellant]: **No**.

THE COURT: All right. Now, **what the Commonwealth is saying, even though you didn't ask for it, you know, they would give you 25 to 50 years**. That's their bottom line. They think that's what the case is worth. Take a look.

Sheriff, can [Appellant] look around and see if there's anyone in the room other than the family?

Do you trust those people in the courtroom?

[Appellant]: Yes.

\* \* \*

[THE COURT]: The bottom line is … we're going to start picking the jury. If you're innocent, by all means, please, go to trial. That's what the system is about. That's your constitutional right. You'll get a fair trial. … So **do you have any questions about the negotiations**?

[Appellant]: **No**.

\* \* \*

[THE COURT]: **You have counsel. You're going to have some more time to talk to him about it. But as of now, do you want a trial or do you want a non[-]trial**?

[Appellant]: **I want a trial**.

THE COURT: Okay. We will get the jurors in the room.

**[Trial] Counsel, why don't you take a little more time to talk to [Appellant]**. I'm assuming that his decision is final unless you tell me something differently ….

N.T., 4/2/18, at 12-17, 18 (emphasis added; some capitalization modified).

The exchanges between the trial court and Appellant belie Appellant's claim of Trial Counsel's ineffectiveness. Appellant has failed to prove he would have accepted the Commonwealth's plea offer if Trial Counsel had advised him differently. *See Steckley*, *supra*. As Trial Counsel was not ineffective, Appellant's layered claim of PCRA Counsel's ineffectiveness fails. *See Burkett*, 5 A.3d at 1270 (if trial counsel was effective, "then subsequent counsel cannot be deemed ineffective for failing to raise the underlying issue.").

In Appellant's second issue, he raises a layered ineffectiveness claim based on Trial Counsel's failure to object to the trial court's purportedly "defective" jury instruction on accomplice liability. *See* Appellant's Brief at 17-23; *see also id.* at 22 ("Because it is unknown which shooter fired the fatal shots, it is exceedingly likely that the jury convicted [Appellant] as an accomplice, believing that it did not matter who fired the fatal shots.").

Where a party challenges the propriety of a jury instruction, an appellate Court must review

the relevant portion of the trial court's charge in context, as a whole, and mindful of the trial court's broad discretion in phrasing

- 20 -

jury instructions as well as the principle that unless a particular instruction is fundamentally erroneous or would have "misled or confused the jury" no relief is due.

***Commonwealth v. Simpson***, 66 A.3d 253, 268 (Pa. 2013) (citation omitted). Simply put, "an appellate court must consider the charge in its entirety, rather than discrete portions of the instruction." ***Commonwealth v. Montalvo***, 244 A.3d 359, 368 (Pa. 2021). "The trial court has broad discretion in phrasing the charge and the instruction will not be found in error if, taken as a whole, it adequately and accurately set forth the applicable law." ***Commonwealth v. Daniels***, 963 A.2d 409, 430 (Pa. 2009). "Where an instruction is alleged to be ambiguous, the standard for review is whether there is a reasonable likelihood that the jury applied it in a manner that violates the Constitution." ***Commonwealth v. Markman***, 916 A.2d 586, 613 (Pa. 2007).

Appellant assails the following statement by the trial court in instructing the jury that

> the defendant is an accomplice of another for a particular crime if the following two elements are proven beyond a reasonable doubt. The defendant had the intent to promote or facilitate the commission of that crime and the defendant solicits, commands, encourages or requests the other person to commit it, aids, agrees to aid or attempts to aid the other person in committing the crime or plan.

N.T., 4/6/18, at 26; ***see also*** Appellant's Brief at 17.

According to Appellant, it "is likely the jury convicted [Appellant] with an improper jury instruction." Appellant's Brief at 23. Appellant claims,

- 21 -

"[w]ithout advising the jury about the 'specific intent to kill' requirement, the instant jury could have wrongly concluded that just 'bringing about the death' of the victim as an accomplice was sufficient for first-degree murder." ***Id.*** at 18; ***see also id.*** at 20 ("Instead of the standard instruction, the trial court should have offered the jury the accomplice liability instruction for first-degree murder."). Appellant further argues

> the trial court's instruction was vague and undefined. The court informed the jury that for accomplice liability, the jury must find that [Appellant] had "the intent to promote or facilitate the commission of *that crime*." N.T., 4/06/2018, at 26 (emphasis added). "That crime," however, was undefined. [Appellant] was charged with multiple crimes.

***Id.*** at 18.

> Conversely, the Commonwealth states:
>
> [Appellant] cannot show prejudice because the jury could not have convicted him based on a faulty theory of accomplice liability. The evidence of [Appellant's] role as the principal killer was overwhelming, and the record conclusively established [Appellant's] specific intent to kill.
>
> Indeed, [Appellant] interposed an alibi defense – *i.e.*, he defended not on the basis that he may have been involved but did not intend to kill, *but on the basis that he was not present or involved in the incident at all*. The evidence starkly proved otherwise.

Commonwealth Brief at 18 (italics in original).

Appellant concedes "the trial court later instructed the jury on the *mens rea* for first-degree murder and that first-degree murder requires a specific intent to kill…." Appellant's Brief at 19; ***see also*** N.T., 4/6/18, at 30-33. Further, our review discloses that the challenged jury instruction, viewed

- 22 -

as a whole, was not so "fundamentally erroneous" as to have "misled or confused the jury[.]" *Simpson*, *supra*; *see also Daniels*, 963 A.2d at 432 ("Considering the instructions in their entirety, and not an excerpt in isolation, it is apparent that the trial court instructed the jury on accomplice liability consistent with this Court's case law."). Thus, there is no reasonable likelihood that the jury applied the jury instruction "in a manner that violates the Constitution." *Markman*, *supra*.

Even if the trial court had erred in instructing the jury on accomplice liability, the error would be harmless. The Pennsylvania Supreme Court has explained:

> The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial. We have described the proper analysis as follows:
>
>> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Hairston*, 84 A.3d 657, 671-72 (Pa. 2014) (citations omitted); *see also Commonwealth v. Noel*, 104 A.3d 1156, 1169 (Pa. 2014) ("If a trial error does not deprive the defendant of the fundamentals of a fair trial, his conviction will not be reversed." (citation omitted)).

Any prejudice from the trial court's jury instruction would have been *de minimis*, as "the uncontradicted evidence of [Appellant's] guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Hairston*, 84 A.3d at 672. In deciding Appellant's direct appeal, this Court concluded that the Commonwealth presented overwhelming evidence of Appellant's guilt. We explained:

> Both Williams and [] Gay identified Appellant as the shooter at trial and in earlier statements to the police. The prosecution presented records from a phone that was at the location of the shooting at the time it had occurred. The phone contained selfies of Appellant and text messages sent from "Meer Meer" a few hours before the shooting occurred. N.T., 4/4/18, at 144-45.
>
> The phone's geolocation records also showed the phone was brought back to Appellant's home after the shooting and eventually taken to a Camden hospital, where Appellant admittedly checked in with a gunshot wound to the foot. Appellant gave a fake name to the Camden medical personnel[] and indicated he had been shot in Camden. However, Camden police found no evidence of a shooting in the area Appellant reported. When confronted with his phone records, Appellant exclaimed [to police] that his "life [was] over" and indicated that he would take responsibility for the murder if no one else was prosecuted. N.T., 4/4/18, at 97.
>
> Moreover, the Commonwealth presented evidence that would allow the jury to infer that Appellant had a motive to kill the [decedent]; Appellant admitted the [decedent] was a member of a rival gang who was suspected to have murdered Appellant's best friend.

*Murphy*, 222 A.3d 847 (unpublished memorandum at 14-15).

Consistent with the foregoing, Appellant's second ineffectiveness issue fails. *See Commonwealth v. Bishop*, 936 A.2d 1136, 1140 (Pa. Super.

- 24 -

2007) (stating where "evidence of guilt is overwhelming, counsel's purported ineffectiveness fails the prejudice prong") (citation omitted).  Accordingly, we affirm the PCRA court's dismissal of Appellant's first PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/21/2023